Filed 1/12/12

# IN THE SUPREME COURT OF CALIFORNIA

BARBARA J. O'NEIL et al.,     )
    )
       Plaintiffs and Appellants,    )
    )             S177401
       v.           )
    )       Ct.App. 2/5 B208225
CRANE CO. et al.,     )
    )       Los Angeles County
       Defendants and Respondents.  )   Super. Ct. No. BC360274
_____)

      This case involves the limits of a manufacturer's duty to prevent foreseeable harm related to its product:  When is a product manufacturer liable for injuries caused by adjacent products or replacement parts that were made by others and used in conjunction with the defendant's product?  We hold that a product manufacturer may not be held liable in strict liability or negligence for harm caused by another manufacturer's product unless the defendant's own product contributed substantially to the harm, or the defendant participated substantially in creating a harmful combined use of the products.

      Defendants Crane Co. (Crane) and Warren Pumps LLC (Warren) made valves and pumps used in Navy warships.  They were sued here for a wrongful death allegedly caused by asbestos released from external insulation and internal gaskets and packing, all of which were made by third parties and added to the pumps and valves post sale.  It is undisputed that defendants never manufactured or sold any of the asbestos-containing materials to which plaintiffs' decedent was exposed.  Nevertheless, plaintiffs claim defendants should be held strictly liable and negligent because it was foreseeable workers would be exposed to and harmed

1

by the asbestos in replacement parts and products used in conjunction with their pumps and valves.

Recognizing plaintiffs' claims would represent an unprecedented expansion of strict products liability. We decline to do so. California law has long provided that manufacturers, distributors, and retailers have a duty to ensure the safety of their products, and will be held strictly liable for injuries caused by a defect in their products. Yet, we have never held that these responsibilities extend to preventing injuries caused by *other* products that might foreseeably be used in conjunction with a defendant's product. Nor have we held that manufacturers must warn about potential hazards in replacement parts made by others when, as here, the dangerous feature of these parts was not integral to the product's design. The broad rule plaintiffs urge would not further the purposes of strict liability. Nor would public policy be served by requiring manufacturers to warn about the dangerous propensities of products they do not design, make, or sell.

## BACKGROUND

### I. *Defendants' Pump and Valve Products on Navy Warships*

During World War II, defendants sold parts to the United States Navy for use in the steam propulsion systems of warships. These propulsion systems were vast and complex. Massive boilers generated steam from seawater. The steam flowed through a maze of interconnected pipes to power the ship's engines and provide energy for use throughout the vessel. A single ship contained several miles of piping. Because the steam flowing through this system was extremely hot and highly pressurized, the pipes and attached components required insulation to prevent heat loss and protect against accidental burns. Navy specifications required the use of asbestos-containing insulation on all external surfaces of the steam propulsion systems. Asbestos insulation was also used as an internal sealant within gaskets and other components of the propulsion system. The Navy preferred asbestos over other types of insulating materials because it was lightweight, strong, and effective. Indeed, asbestos was considered to be such an

2

important resource that a 1942 federal regulation ordered its conservation for the war effort. (Conservation order No. M-123, 7 Fed.Reg. 2472 (Mar. 31, 1942).) Plaintiffs' expert admitted there was no acceptable substitute for asbestos until at least the late 1960's. Warships could not have been built without it.

The Navy's Bureau of Ships oversaw the design and construction of warships. Naval engineers created specifications that provided detailed design, material, and performance requirements for equipment to be used on board. Equipment that did not conform with the Navy's specifications was rejected. Product manufacturers were required to comply with naval specifications, including those mandating the use of asbestos.

Crane produced valves for Navy ships according to these strict military specifications. The steam propulsion system in a typical warship included hundreds of valves of different sizes and functions. In general, valves controlled the flow of steam from one point to another through the system. Packing materials inside valves were used as sealants, to protect against leakage of high-pressure steam or liquids. Although cotton packing was sometimes used for colder-temperature applications, the majority of packing used on Navy ships contained asbestos. Gaskets were also used inside the valves to seal the joints between metal surfaces. Although some gaskets were made of metal, the gaskets used in valves, flanges, or pump casings generally contained asbestos. During the early 1940's, Navy specifications required that the internal gaskets and packing materials in valves contain asbestos. At that time, asbestos was the only insulating material that could withstand the extremely high temperatures and pressures produced by a warship's steam propulsion system. Following mandated Navy specifications, Crane used asbestos in its valves and packing. However, no evidence was presented that asbestos, as opposed to some other type of insulation material, was needed in order for the valves to function properly. Indeed, Crane made some valves of corrugated iron, which contained no asbestos. Crane did not

3

manufacture the asbestos packing or gaskets used in its valves. It purchased these components from Navy-approved vendors.

Warren supplied pumps. Navy ships contained hundreds of pumps used for various purposes. In the steam propulsion system of a warship, pumps moved liquids and condensed steam. Like Crane, Warren built its pumps for specific ships in accordance with stringent naval specifications. Most of these pumps had internal gaskets and packing that contained asbestos.[1] One Warren pump also had asbestos insulation around a valve stem, but it was covered with a layer of sheet metal. The pumps were not made or shipped with external insulation. As with Crane's valves, no evidence was presented that Warren's pumps required the use of internal components made with asbestos in order to operate.

Once the parts were received, shipbuilders integrated them into a complex steam-propulsion system. Pumps and valves were connected to other components, such as boilers and piping, with asbestos-containing flange gaskets. Neither Crane nor Warren produced these flange gaskets. All metal components of the steam-propulsion system, including miles of piping, were then covered in a layer of asbestos insulation. This insulation was made and sold by other companies, most notably Johns Manville. Neither Crane nor Warren produced the external insulation. The valves and pumps did not need external insulation in order to function.

The gaskets and packing inside Crane's valves and Warren's pumps were replaced during routine maintenance. No evidence was presented that Warren ever made or sold these replacement parts. Crane did not manufacture asbestos packing or gaskets. Although Crane did at one time sell replacement packing and gaskets for use in maintaining and repairing its valves, these products were generally shipped under the label of the packing or gasket manufacturer and often

---

[1] However, pumps that were not used for high-temperature applications often had no asbestos-containing parts. For example, some pumps contained gaskets made of plant fiber, with plastic packing.

4

shipped directly from that manufacturer to the customer. There was no evidence that the Navy ever purchased replacement gaskets or packing materials from Crane.

## II.  *Plaintiff's Exposure to Asbestos*

Patrick O'Neil served on the USS *Oriskany* (*Oriskany*) from 1965 to 1967. The *Oriskany* was a large "Essex class" aircraft carrier carrying up to 4,000 crew members. The ship was authorized in 1942, launched in 1945, and commissioned to active service in 1950. Crane and Warren supplied equipment for the *Oriskany*'s steam propulsion system in 1943 or earlier, at least 20 years before O'Neil worked aboard the ship.

Among his other duties on the *Oriskany*, O'Neil supervised the enlisted men who repaired equipment in the engine and boiler rooms. This work exposed him to airborne asbestos fibers. Asbestos-containing products are not dangerous when intact. The health hazard arises when the products are cut or damaged, releasing asbestos fibers that can be inhaled. (See *San Francisco Unified School Dist. v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1325.) To access a piece of equipment, repairmen first had to remove the outer layer of insulation, which generated large amounts of asbestos dust. Removal of the flange gaskets connecting pumps and valves to other components also produced asbestos dust, as did removal and replacement of the packing and gaskets inside pumps and valves. A coworker testified that O'Neil encountered dust from all of these sources. As early as 1922, the Navy was aware that airborne asbestos could potentially cause lung diseases. Its industrial hygienists conducted studies on the health effects of asbestos exposure from the prewar period until well into the 1960's. Nevertheless, the Navy did not warn seamen about the hazards of working with asbestos-

5

containing materials and did not advise them to wear respirators or take other precautions during dusty work.**2**

To the extent O'Neil was exposed to dust generated during work on pumps and valves, no evidence was presented that any of the asbestos-containing dust came from a product made by Crane or Warren. Neither company manufactured or sold the external insulation or flange gaskets that repairmen removed. Although Crane's valves and Warren's pumps contained internal asbestos-containing gaskets and packing when the *Oriskany* was built, these original components had been replaced long before O'Neil boarded the ship 20 years later. There was no evidence that any of these replacement parts were made by Crane or Warren.

In 2004, nearly 40 years after he worked on the *Oriskany*, O'Neil developed mesothelioma, a fatal cancer of the lining of the lung caused by asbestos exposure. He died just over a year later, at age 62. In 2006, O'Neil's family filed a wrongful death complaint raising strict liability and negligence claims against several companies that had allegedly supplied asbestos-containing products to the Navy.

Following the close of evidence, Crane moved for nonsuit on all causes of action. Among other things, Crane argued there was no evidence O'Neil had been exposed to asbestos from any Crane product, and no evidence that any product defect or failure to warn by Crane was a substantial factor in causing O'Neil's mesothelioma. Warren joined Crane's motion and also sought nonsuit on the ground that no evidence showed O'Neil had been exposed to any asbestos from the repair or maintenance of a Warren pump. In response, plaintiffs' counsel argued that even if O'Neil was not exposed to asbestos released from a Crane or

---

**2**      The Navy is immune from liability for injuries arising from the use of asbestos in shipyards and warships. (*Collins v. Plant Insulation Co.* (2010) 185 Cal.App.4th 260, 270; *Sea-Land Service, Inc. v. United States* (3d Cir. 1990) 919 F.2d 888, 892-893.)

6

Warren product, these manufacturers bore responsibility for his injuries because their products originally included asbestos-containing components, and it was foreseeable that these parts would wear and be replaced with other asbestos-containing components, and that these repair and maintenance procedures would release harmful asbestos dust.

The trial court granted the motions and dismissed all claims against Crane and Warren.[3] The court found there was no evidence defendants' products were inherently dangerous except for the undisturbed internal asbestos components some contained. Further, although the nonsuit motions did not raise this ground, the court found that the component parts doctrine shielded defendants from liability because the Navy integrated defendants' nondefective products into a larger, sophisticated system, and defendants did not control or participate in this integration process. (See *Artiglio v. General Electric Co.* (1998) 61 Cal.App.4th 830; Rest.3d Torts, Products Liability, § 5, p. 130.) On appeal, this decision was reversed.

The Court of Appeal held that the component parts defense applies only to manufacturers of "multiuse or fungible products" designed to be altered and incorporated into another product. It then concluded defendants' products did not meet these requirements. The Court of Appeal also rejected defendants' argument that they could not be found strictly liable because they did not manufacture or supply the asbestos-containing products that caused O'Neil's mesothelioma. The court announced a broad definition of strict products liability: "[A] manufacturer is liable in strict liability for the dangerous components of its products, and for dangerous products with which its product will necessarily be used." Even though it was *replacement* gaskets and packing that caused O'Neil's disease, the court concluded these replacement parts were "no different" from the asbestos-

---

[3] The court also dismissed claims against Yarway Corporation, a pump manufacturer that had moved for nonsuit on the same grounds asserted by Crane and Warren. In January 2009, plaintiffs dismissed their appeal against Yarway.

containing components originally included in defendants' products. The court remarked, "If respondents had warned the hypothetical original user, or protected that person by avoiding defective design, subsequent users, too, would have been protected." The Court of Appeal asserted defendants' products were defectively designed "because they required asbestos packing and insulation." This factual assertion is unsupported by the record. Trial evidence established that the requirement for asbestos derived from military specifications, not from any inherent aspect of defendants' pump and valve designs.[4]

We granted review and now reverse.

## DISCUSSION

In reviewing a judgment of nonsuit, "we must view the facts in the light most favorable to the plaintiff. '[C]ourts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper. The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor. [Citations.] [¶] In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor . . . ." ' [Citation.] The same rule applies on appeal from the grant of a nonsuit. [Citation.]" (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214-1215.)

## I. *Strict Liability*

Strict liability has been imposed for three types of product defects: manufacturing defects, design defects, and " 'warning defects.' " (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995.) The third category

---

**4** Defendants raised this issue in a petition for rehearing, which was denied.

8

describes "products that are dangerous because they lack adequate warnings or instructions." (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 428.) A bedrock principle in strict liability law requires that "the plaintiff's injury must have been caused by a 'defect' in the [defendant's] product." (*Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 733.)

Plaintiffs argue defendants' products were defective because they included and were used in connection with asbestos-containing parts. They also contend defendants should be held strictly liable for failing to warn O'Neil about the potential health consequences of breathing asbestos dust released from the products used in connection with their pumps and valves. These claims lack merit. We conclude that defendants were not strictly liable for O'Neil's injuries because (a) any design defect in *defendants' products* was not a legal cause of injury to O'Neil, and (b) defendants had no duty to warn of risks arising from *other manufacturers'* products.

### A.    *No Liability Outside a Defective Product's Chain of Distribution*

From the outset, strict products liability in California has always been premised on harm caused by deficiencies in the defendant's own product. We first announced the rule in *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 (*Greenman*): "A manufacturer is strictly liable in tort when an article *he places on the market*, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (Italics added.) We explained that "[t]he purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Id*. at p. 63.) A year later, we extended strict liability to retailers, reasoning that, as an "integral part of the overall producing and marketing enterprise," they too should bear the cost of injuries from defective products. (*Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 262; see also *Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 130 [listing other entities in the

9

chain of commerce to whom strict liability has been applied]; *Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 586 [extending the protection of strict liability to bystanders].)

Strict liability encompasses all injuries caused by a defective product, even those traceable to a defective component part that was supplied by another. (*Vandermark v. Ford Motor Co.*, *supra*, 61 Cal.2d at p. 261.) However, the reach of strict liability is not limitless. We have never held that strict liability extends to harm from entirely distinct products that the consumer can be expected to use with, or in, the defendant's nondefective product. Instead, we have consistently adhered to the *Greenman* formulation requiring proof that the plaintiff suffered injury caused by a defect in the defendant's own product. (*Cronin v. J.B.E. Olson Corp.*, *supra*, 8 Cal.3d at pp. 131-135.) Regardless of a defendant's position in the chain of distribution, "the basis for his liability remains that he has marketed or distributed a defective product" (*Daly v. General Motors Corp.*, *supra*, 20 Cal.3d at p. 739), and that product caused the plaintiff's injury.

In *Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1189, the plaintiff was injured when she fell in a hotel bathtub. We concluded it would be improper to impose strict liability on the hotel proprietor for injuries caused by an alleged defect in hotel premises that the proprietor did not build or market. (*Id.* at p. 1188.) We stressed that strict products liability should be imposed only on those entities responsible for placing a defective product into the stream of commerce. (*Id.* at pp. 1198-1199.) Because those outside the marketing enterprise "generally ha[ve] no 'continuing business relationship' with the manufacturer of the defective product," they "cannot exert pressure upon the manufacturer to make the product safe and cannot share with the manufacturer the costs of insuring the safety" of the product's user. (*Id.* at p. 1199.) We also observed that, although many potentially defective products are used in a hotel or restaurant setting, "[t]he mere circumstance that it was contemplated customers of these businesses would use the products . . . or be benefited by them does not

10

transform the owners of the businesses into the equivalent of retailers of the products. [Citation.]" (*Id*. at pp. 1199-1200.) The mere foreseeability of injury to users of a defective product was not sufficient justification for imposing strict liability outside the stream of commerce.

In this case, it is undisputed that O'Neil was exposed to *no* asbestos from a product made by the defendants. Although he was exposed to potentially high levels of asbestos dust released from insulation the Navy had applied to the exterior of the pumps and valves, Crane and Warren did not manufacture or sell this external insulation. They did not mandate or advise that it be used with their products. O'Neil was also exposed to asbestos from the replacement gaskets and packing inside the pumps and valves. Yet, uncontroverted evidence established that these internal components were not the original parts supplied by Crane and Warren. They were replacement parts the Navy had purchased from other sources.[5]

It is fundamental that the imposition of liability requires a showing that the plaintiff's injuries were caused by an act of the defendant or an instrumentality under the defendant's control. (*Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588, 597.) "A manufacturer is liable only when a defect in its product was a legal cause of injury." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) Although the internal gaskets and packing originally supplied with defendants' products contained asbestos, none of these original parts remained on board the *Oriskany* by the time O'Neil arrived decades later. Accordingly, even assuming the inclusion of asbestos makes a product defective, no defect inherent in defendants' pump and valve products caused O'Neil's disease.

Nor does the record support plaintiffs' claim that defendants' products were defective because they were "designed to be used" with asbestos-containing

---

[5]    Although Crane did at one time sell replacement gaskets and packing, there is no evidence the Navy ever purchased these replacement parts from Crane or installed them on the *Oriskany*.

components.  The products were designed to meet the Navy's specifications.
Moreover, there was no evidence that defendants' products *required* asbestos-
containing gaskets or packing in order to function.  Plaintiffs' assertion to the
contrary is belied by evidence that defendants made some pumps and valves
without asbestos-containing parts.  As alternative insulating materials became
available, the Navy could have chosen to replace worn gaskets and seals in
defendants' products with parts that did not contain asbestos.  Apart from the
Navy's specifications, no evidence showed that the design of defendants' products
required the use of asbestos components, and their mere compatibility for use with
such components is not enough to render them defective.[6]

Plaintiffs and some amici curiae also suggest that defendants' products
were defective because they became hot during high-temperature applications, and
this heat "baked on" the thermal insulation, causing asbestos in the insulation to
become "friable."  Friable insulation materials may crumble and release respirable
asbestos fibers into the air.  (*San Francisco Unified School Dist. v. W.R. Grace &
Co.*, *supra*, 37 Cal.App.4th at p. 1325.)  Of course, a high operating temperature
was unavoidable given the intended use of these pumps and valves.  Because
transferring heat was integral to the products' functioning, it cannot be labeled a
"defect."  (See Rest.2d Torts, § 402A, com. i, p. 352 [for strict liability to apply,
"[t]he article sold must be dangerous to an extent beyond that which would be

---

[6]     A stronger argument for liability might be made in the case of a product
that *required* the use of a defective part in order to operate.  In such a case, the
finished product would inevitably incorporate a defect.  One could argue that
replacement of the original defective part with an identically defective one
supplied by another manufacturer would not break the chain of causation.
Similarly, if the product manufacturer specified or required the use of a defective
replacement part, a stronger case could be made that the manufacturer's failure to
warn was a proximate cause of resulting injury.  In both contexts, however, the
policy rationales against imposing liability on a manufacturer for a defective part it
did not produce or supply would remain.  (See *post*, at pp. 29-30.)  These difficult
questions are not presented in the case before us, and we express no opinion on
their appropriate resolution.

12

contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics"].)  Moreover, the product that had the propensity to become friable and release a hazardous substance was the asbestos-containing thermal insulation made by other manufacturers and applied by others to defendants' pumps and valves.  The defective product in this setting was the asbestos insulation, not the pumps and valves to which it was applied after defendants' manufacture and delivery.

**B.**     *No Duty to Warn of Defects in Another Manufacturer's Product*

Plaintiffs also argue that defendants had a duty to warn O'Neil about the hazards of asbestos because the release of asbestos dust from surrounding products was a foreseeable consequence of maintenance work on defendants' pumps and valves.

**1.**     *General Principles*

"Generally speaking, manufacturers have a duty to warn consumers about the hazards inherent in their products.  (*Anderson* [*v. Owens-Corning Fiberglas Corp.*], *supra*, 53 Cal.3d at p. 1003.)  The requirement's purpose is to inform consumers about a product's hazards and faults of which they are unaware, so that they can refrain from using the product altogether or evade the danger by careful use.  (*Ibid.*)  Typically, under California law, we hold manufacturers strictly liable for injuries caused by their failure to warn of dangers that were known to the scientific community at the time they manufactured and distributed their product. [Citations.]"  (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64-65.)  However, we have never held that a manufacturer's duty to warn extends to hazards arising exclusively from *other* manufacturers' products.  A line of Court of Appeal cases holds instead that the duty to warn is limited to risks arising from the manufacturer's own product.

In *Garman v. Magic Chef, Inc.* (1981) 117 Cal.App.3d 634, 636-637, an explosion resulted from a leak in the propane gas tubing system attached to the defendant's nondefective stove.  The Court of Appeal held that the stove

13

manufacturer had no duty to warn about the potential for gas leaks from other products, even though the explosion was ignited by a flame on the stove. It explained: "The use of any product can be said to involve some risk because of the circumstances surrounding even its normal use. Nonetheless, the makers of such products are not liable under any theory, for merely failing to warn of injury which may befall a person who uses that product in an unsafe place or in conjunction with another product which because of a defect or improper use is itself unsafe." (*Id*. at p. 638.) In *Blackwell v. Phelps Dodge Corp.* (1984) 157 Cal.App.3d 372, 375, workers were injured by the explosion of a tank car filled with sulfuric acid. The plaintiffs alleged the *tank car* was defective because it allowed pressure to build in the cargo compartment. They further claimed the sulfuric acid supplier had a duty to warn them of possible harm from a defective container. (*Id*. at p. 377.) The court rejected this theory, explaining that "[w]hile failure to warn may create liability for harm caused by use of an unreasonably dangerous product, that rule does not apply where it was not any unreasonably dangerous condition or feature of *defendant's* product which caused the injury. [Citation.]" (*Ibid*.)

The decision in *Powell v. Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357 is relevant to plaintiffs' claim that defendants had a duty to warn O'Neil of the hazardous nature of replacement gaskets and packing. In *Powell*, workers were injured in an explosion caused by use of an electric buffer with lacquer thinner. (*Id*. at p. 361.) Although they had used the defendant's lacquer thinner earlier in the job, on the day of the explosion they were using thinner made by another manufacturer. (*Ibid*.) The Court of Appeal rejected the workers' argument that the defendant should be liable for failing to warn them about the flammable nature of lacquer thinner, noting, "no reported decision has held a manufacturer liable for its failure to warn of risks of using its product, where it is shown that the immediate efficient cause of injury is a product manufactured by someone else." (*Id*. at p. 362.) The defendant owed a duty to warn about

14

hazardous characteristics of its own lacquer thinner, and had breached that duty by failing to provide a warning, but it bore no liability because "the immediate efficient cause" of the workers' injuries was the explosion of a product made by someone else. (*Id.* at p. 363; see *Sindell v. Abbott Laboratories*, *supra*, 26 Cal.3d at p. 597.)[7]

So too here. Crane and Warren gave no warning about the dangers of asbestos in the gaskets and packing originally included in their products. However, O'Neil never encountered these original parts. His exposure to asbestos came from replacement gaskets and packing and external insulation added to defendants' products long after their installation on the *Oriskany*. There is no dispute that these external and replacement products were made by other manufacturers. "[N]o case law . . . supports the idea that a manufacturer, after selling a completed product to a purchaser, remains under a duty to warn the purchaser of potentially defective additional pieces of equipment that the purchaser may or may not use to complement the product bought from the manufacturer." (*In re Deep Vein Thrombosis* (N.D.Cal. 2005) 356 F.Supp.2d 1055, 1068.)[8]

---

[7] Although the *Powell* court expounded at length on the legal and policy rationales for limiting a manufacturer's duty to warn to harms arising from its own product, and endeavored to describe the limited circumstances under which liability for failure to warn could extend to injuries caused by a "generically identical" product with the same risks as the manufacturer's product (*Powell v. Standard Brands Paint Co.*, *supra*, 166 Cal.App.3d at pp. 363-365), the court did not decide whether such liability could be imposed in the case before it because this theory had not been pleaded in the complaint. (*Id.* at pp. 365-366.)

[8] In *In re Deep Vein Thrombosis*, passengers who allegedly developed injury from defective airline seating sued the airplane manufacturer, Boeing Company. The evidence showed that Boeing manufactured planes with no installed seating; instead, airlines purchased seating from a separate manufacturer and installed the seats without Boeing's involvement. (*In re Deep Vein Thrombosis*, *supra*, 356 F.Supp.2d at pp. 1058-1059.) The district court held Boeing had no duty to warn the airlines or passengers about the risk of injury from unsafe seating designs. (*Id.* at pp. 1067-1069.)

15

Decisions from other jurisdictions are in accord. *Rastelli v. Goodyear Tire & Rubber Co.* (1992) 79 N.Y.2d 289 [591 N.E.2d 222] (*Rastelli*) and *Baughman v. General Motors Corp.* (4th Cir. 1986) 780 F.2d 1131 (*Baughman*) both involved injuries resulting from the explosion of a multipiece wheel rim during a tire change. In *Rastelli*, the plaintiff sued the tire manufacturer, arguing that Goodyear should have warned about the inherent dangers of multipiece rims because its tires were compatible for use with such rims. (*Rastelli*, 591 N.E.2d at p. 225.) New York's highest court refused to impose such a duty based solely on foreseeability. The court stressed that Goodyear had no control over the defective rim's production or marketing, it derived no benefit from the rim's sale, and Goodyear's own product did not create the defect or combine with the rim to create a hazardous condition that did not previously exist. (*Id*. at pp. 225-226.) The plaintiff in *Baughman* sued a vehicle manufacturer on the theory that, even though General Motors did not make the wheel that exploded, the company shipped its trucks with a similar type of wheel that was also dangerous. (*Baughman*, at p. 1132.) A federal court of appeals rejected this argument for the same reasons expressed by the New York court: "Where, as here, the defendant manufacturer did not incorporate the defective component part into its finished product and did not place the defective component into the stream of commerce, the rationale for imposing liability is no longer present. The manufacturer has not had an opportunity to test, evaluate, and inspect the component; it has derived no benefit from its sale; and it has not represented to the public that the component part is its own." (*Id*. at pp. 1132-1133; see also *Brown v. Drake-Willock Internat., Ltd.* (1995) 209 Mich.App.136, 145, 149 [530 N.W.2d 510, 514, 516] [manufacturer of a dialysis machine had no duty to warn about the health risks of formaldehyde used to clean the machine].)

16

## 2.    *Application in the Asbestos Context*

### a.    *The* Taylor v. Elliott Turbomachinery Co. *Decision*

In 2009, the First District Court of Appeal addressed the very question presented here.  In *Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564, 571-572 (*Taylor*), a serviceman developed mesothelioma from his exposure to asbestos on a warship.  Like O'Neil, Taylor worked in the ship's engine room.  In the course of his duties, Taylor sometimes removed and replaced the internal gaskets, packing, and insulation pads used in pumps and valves. (*Ibid.*)  After his death, Taylor's family sued the manufacturers of these pumps and valves.[9]  They argued, as plaintiffs do here, "that a 'manufacturer has a duty to warn of hazards arising from the foreseeable uses of its product, even if that hazard arises from the addition of a product that, although manufactured by another, is used in the normal and intended operation of the defendant's product.' " (*Taylor*, at pp. 572-573.)  The Court of Appeal determined that pump and valve manufacturers could not be held strictly liable for failing to warn about the dangers of asbestos exposure.  It gave three reasons for this conclusion.

"First, California law restricts the duty to warn to entities in the chain of distribution of the defective product." (*Taylor*, *supra*, 171 Cal.App.4th at p. 575.) Based on authorities discussed above, including *Peterson v. Superior Court*,

---

[9]    Crane and Warren were among the defendants. (*Taylor*, *supra*, 171 Cal.App.4th at p. 570, fn. 1.)  Some commentators have observed that, due to the bankruptcies of Johns Manville and other major suppliers of asbestos-containing products, asbestos personal injury litigants have shifted their focus in the past decade to "ever-more peripheral defendants," like pump and valve manufacturers. (Calnan & Stier, *Perspectives on Asbestos Litigation: Overview and Preview* (2008) 37 Sw.U. L. Rev. 459, 463; see also Stephen J. Carroll et al., Asbestos Litigation (RAND Inst. for Civil Justice 2005) p. xxiii <http://www.rand.org/pubs/monographs/2005/RAND_MG162.pdf> [as of January 12, 2012] [in the late 1990's, bankruptcy-related litigation stays drove plaintiffs "to press peripheral non-bankrupt defendants to shoulder a larger share of the value of asbestos claims and to widen their search for other corporations that might be held liable"].)

*supra*, 10 Cal.4th 1185, and *Soule v. General Motors Corp.*, *supra*, 8 Cal.4th 548, the *Taylor* court observed that our strict products liability precedents have recognized "a bright-line legal distinction" imposing liability only on those entities responsible for placing an injury-producing product into the stream of commerce. (*Taylor*, at p. 576.) The pump and valve manufacturers could not be strictly liable for failure to warn, the court concluded, because these companies "were not part of the 'chain of distribution' of the gaskets, packing, discs, and insulation that Mr. Taylor encountered." (*Id*. at p. 579.)

Second, in a related holding, the Court of Appeal determined that "in California, a manufacturer has no duty to warn of defects in products supplied by others and used in conjunction with the manufacturer's product unless the manufacturer's product itself causes or creates the risk of harm." (*Taylor*, *supra*, 171 Cal.App.4th at p. 575.) The court rejected the notion that a manufacturer has a duty to warn whenever the intended use of its product will expose consumers to risks arising from the product of another. (*Id*. at p. 580.) Relying on analogous failure to warn cases, the court concluded that, in general, a manufacturer's duty to warn is limited to the dangerous propensities of its own products. (*Id*. at pp. 580-583; see *Garman v. Magic Chef, Inc.*, *supra*, 117 Cal.App.3d 634, *Blackwell v. Phelps Dodge Corp.*, *supra*, 157 Cal.App.3d 372; *Powell v. Standard Brands Paint Co.*, *supra*, 166 Cal.App.3d 357; see also *In re Deep Vein Thrombosis*, *supra*, 356 F.Supp.2d 1055.) "Although a manufacturer *may* owe a duty to warn when the use of its product in combination with the product of another creates a potential hazard, that duty arises *only* when the manufacturer's own product causes or creates the risk of harm." (*Taylor*, at p. 580.)

Third, the *Taylor* court determined that the component parts doctrine provided an alternate basis for concluding the pump and valve manufacturers owed no duty to warn about the dangers of asbestos. (*Taylor*, *supra*, 171 Cal.App.4th at pp. 584-586.) The component parts doctrine provides that the manufacturer of a component part is not liable for injuries caused by the finished

18

product into which the component has been incorporated unless the component itself was defective and caused harm. (*Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 480-481; Rest.3d Torts, Products Liability, § 5(a), p. 130; *Taylor*, at p. 575.) Based on evidence that the pumps and valves were designed to operate "as part of a larger 'marine steam propulsion system' " (*Taylor*, at p. 584), the court concluded the manufacturers could be held liable only if defects in these components caused injury or if the manufacturers participated in the integration of their pumps and valves into the ship's propulsion system. (*Id.* at p. 585.) Because neither of these requirements was met, the manufacturers could not be held liable for asbestos-induced injuries. (*Ibid.*)[10]

### b. *Out-of-state Decisions*

As additional support for its holdings, the *Taylor* court discussed a pair of asbestos cases from Washington state and a federal case from Ohio. These decisions are instructive.

In *Simonetta v. Viad Corp.* (2008) 165 Wn.2d 341, 345 [197 P.3d 127, 129] (*Simonetta*), the Washington Supreme Court proposed to answer "whether under the common law a manufacturer can be held liable for failure to warn of the hazards of another manufacturer's product." When Simonetta served as a fireman and machinist aboard a Navy vessel from 1958 to 1959, he performed maintenance on a seawater evaporator manufactured by the defendant's predecessor. The evaporator was insulated with asbestos mud and cloth, and Simonetta had to remove this insulation to service the machine. (*Id.*, 197 P.3d at p. 130.) Over 40 years later, Simonetta developed lung cancer and sued. He claimed the evaporator manufacturer had a duty to warn about the dangers of

---

**10**    In so finding, the court rejected an argument that the component parts doctrine shields only manufacturers of "fungible, multi-use components." (*Taylor*, *supra*, 171 Cal.App.4th at p. 584.) We express no opinion on whether the pumps and valves used in marine propulsion systems are "fungible," or whether the component parts defense is limited to fungible products.

respirable asbestos because it knew or reasonably should have known that asbestos would be used to insulate its product and would have to be removed in the course of normal maintenance and repairs. (*Ibid*.) An intermediate appellate court accepted this argument, holding that " 'when a product requires the use of another product and the two together cause a release of a hazardous substance, the manufacturer has a duty to warn about the inherent dangers.' " (*Ibid*.) Washington's highest court disagreed. It held that the duty to warn, in negligence or strict liability, extends only to those entities in the chain of distribution of a hazardous product. (197 P.3d at pp. 133-134, 138.) Because the hazardous product was the asbestos insulation applied to the evaporator, not the evaporator itself, and because the defendant did not manufacture, sell, or supply this asbestos insulation, the defendant had no duty to warn about the dangers of asbestos exposure. (*Id*. at p. 138.)

While *Simonetta* speaks to liability for injuries arising from external insulation, its companion case, *Braaten v. Saberhagen Holdings* (2008) 165 Wn.2d 373 [198 P.3d 493] (*Braaten*), also addressed the problem of injuries arising from asbestos-containing replacement parts. Braaten, a pipefitter on Navy ships, was exposed to asbestos from 1967 until the early 1980's. Braaten performed regular maintenance on steam pumps and valves, which required him to remove and replace asbestos-containing external insulation, gaskets, and packing. (*Id*., 198 P.3d at p. 496.) He developed mesothelioma in 2003 and sued several pump and valve manufacturers, arguing they had a duty to warn him about the dangers of exposure to asbestos in external insulation and in replacement packing and gaskets. Although the defendants' products had originally included asbestos-containing packing and gaskets, these parts had been replaced several times before Braaten encountered the pumps and valves. The defendants did not manufacture or sell these replacement parts. (*Id*. at pp. 495-496.) The Washington Supreme Court concluded that the holding in *Simonetta* applied equally to internal asbestos-containing components made by others: "[T]he general rule that there is no duty

20

under common law products liability or negligence principles to warn of the dangers of exposure to asbestos in other manufacturers' products applies with regard to replacement packing and gaskets. The defendants did not sell or supply the replacement packing or gaskets or otherwise place them in the stream of commerce, did not specify asbestos-containing packing and gaskets for use with their valves and pumps, and other types of materials could have been used." (*Braaten*, at pp. 495-496.) Accordingly, the court held that pump and valve makers had no duty to warn about the risks of exposure to asbestos, either from thermal insulation applied to their products by the Navy or from replacement gaskets and packing materials. (*Id*. at p. 503.)

The *Simonetta* and *Braaten* decisions both discussed *Lindstrom v. A-C Product Liability Trust* (6th Cir. 2005) 424 F.3d 488 (*Lindstrom*), a case involving very similar facts. Lindstrom, a merchant seaman, developed mesothelioma after years of working in the engine rooms of numerous ships. (*Id*. at p. 491.) After the federal district court dismissed his claims against certain pump and valve manufacturers, Lindstrom appealed. As in the Washington cases, and here, Lindstrom alleged he was exposed to asbestos-containing gaskets and packing materials when he worked on pumps and valves, but the evidence established that all of this exposure was to replacement parts manufactured by other companies. The gaskets and packing originally supplied with the pumps and valves had been replaced several times before Lindstrom worked on the defendants' products. (*Id*. at pp. 494-497.) The Court of Appeals for the Sixth Circuit upheld dismissal of the pump and valve manufacturers, ruling insufficient evidence connected Lindstrom with asbestos released from the defendants' products. "Lindstrom almost certainly could not have handled the original packing or gasket material, and this fact compels the conclusion that any asbestos that he may have been exposed to in connection with [the defendant's] product would be attributable to some other manufacturer." (*Id*. at p. 495.) The court did not consider whether a duty to warn could ever extend to replacement parts, but rejected Lindstrom's

21

claims as simply lacking in causation. It reasoned that a manufacturer "cannot be held responsible for material 'attached or connected' to its product" (*ibid*.) or otherwise "incorporated into its product post-manufacture." (*Id*. at p. 497; see also *Stark v. Armstrong World Indus., Inc.* (6th Cir. 2001) 21 Fed.Appx. 371, 378, 381.)

The issue of liability for replacement parts has also arisen in other types of asbestos cases. In *Ford Motor v. Wood* (1998) 119 Md.App. 1, 33 [703 A.2d 1315, 1330], family members of mechanics who died of mesothelioma sued an auto manufacturer for failing to warn about the dangers involved in replacing asbestos-containing brakes and clutches on its vehicles. It was undisputed that the mechanics were exposed to asbestos from replacement parts and not from the original brakes and clutches shipped in Ford vehicles. (*Ibid*.) A Maryland appellate court refused to hold Ford strictly liable and rejected the plaintiffs' belatedly raised failure to warn theory, concluding Ford had no duty to warn about the dangers of a product it did not place into the stream of commerce. (703 A.2d at p. 1332.) [11] Similarly, a federal court in Illinois refused to hold an aircraft manufacturer liable for injuries caused by a repairman's exposure to asbestos-containing replacement parts. (*Niemann v. McDonnell Douglas Corp.* (S.D.Ill. 1989) 721 F.Supp. 1019.) The district court found it of no moment that the defendant had originally installed asbestos chafing strips on its airplanes because these strips had been replaced many times before the repairman's exposure, and the defendant did not supply the replacement strips. (*Id*. at pp. 1029-1030.)

Reliance on the "adjacent products" theory of liability was stretched perhaps the farthest in *Macias v. Mine Safety Appliances Co.* (2010) 158 Wn.App.

---

[11] Contrary to the plaintiffs' assertion on appeal, the case had not been tried or submitted to the jury on the theory that Ford had a duty to warn about hazards in replacement brakes and clutches. (*Ford Motor v. Wood*, *supra*, 703 A.2d at pp. 1330-1331.) The court observed that, even assuming the issue had been properly preserved, "we would not find liability under that theory as a matter of law." (*Id*. at p. 1331.)

931 [244 P.3d 978]. Macias, a tool keeper, used respirators made by different companies to mitigate exposure to asbestos and other toxic dust and fumes. (*Id.*, 244 P.3d at p. 979.) When Macias developed mesothelioma, he sued the respirator makers for failing to warn him about the dangers of exposure to asbestos dust. On discretionary review from a denial of summary judgment, the Washington appellate court observed that the connection between the defendants' products and the plaintiff's asbestos exposure was "even more remote" than in *Simonetta* and *Braaten*. (*Macias*, 244 P.3d at p. 982.) Because the respirator manufacturers did not manufacture, sell, or supply the asbestos that harmed Macias, and thus were not in the chain of distribution of a harmful product, the court held they had no duty to warn about the dangers of asbestos. (244 P.3d at p. 983.) The court stressed that a duty to warn arises when the manufacturer is in a harmful product's chain of distribution. It declined to extend that duty when the purpose of the defendant's product is to prevent exposure to a hazardous substance. The foreseeability that customers will have such exposure is not enough to establish a duty to warn: "The respirator manufacturers' ability to foresee that their products would be used in tandem with hazardous substances like asbestos, and that cleaning and maintaining their respirators might expose workers to asbestos, does not give rise to a duty to warn under [Rest.2d Torts] section 388 where the respirator manufacturers were not involved in manufacturing, supplying, or distributing the asbestos." (*Ibid.*; see also *Simonetta*, *supra*, 197 P.3d at p. 131, fn. 4 [" 'Foreseeability does not create a duty but sets limits once a duty is established.' "].)

### 3. *Plaintiffs' Authorities Are Distinguishable*

The Court of Appeal here disagreed with *Taylor* and ignored the out-of-state decisions discussed above. Instead, the court relied on its own prior decision in *Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577 (*Tellez-Cordova*), and two other Court of Appeal opinions, as support for its conclusion that "a manufacturer is liable in strict liability for the

dangerous components of its products, *and for dangerous products with which its product will necessarily be used.*" (Italics added.) The reliance is misplaced. These cases do not support the broad expansion of strict liability law proposed in the second clause of the Court of Appeal's holding.

In *DeLeon v. Commercial Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336, 340 (*DeLeon*), the question was whether "custom-made factory equipment which is safe to use in some locations [is] 'defective' because in a particular location its use may bring the operator in contact with an adjacent rotating line shaft built and maintained by the plant owners." DeLeon was injured when she was cleaning the defendant's shaker bin and her arm became tangled in an exposed rotating line shaft located above the bin. (*Id*. at pp. 340-341.) She sued both her employer, which had designed and installed the line shaft, and the manufacturer of the shaker bin. On appeal from the manufacturer's dismissal on summary judgment, the court found a triable issue of fact regarding whether the bin's designed proximity to the line shaft presented an " 'excessive preventable danger.' " (*Id*. at p. 344.) Because the intended use of the bin included periodic cleaning, the court reasoned that the bin's dimensions and its placement near an exposed line shaft arguably constituted design defects and gave rise to a duty to warn. (*Id*. at pp. 346, 348-349.)

In some respects, *DeLeon*'s facts resemble those presented here. Like DeLeon, O'Neil suffered a foreseeable injury not from the defendant's product, but from another manufacturer's product located nearby. An important difference, however, is that the bin manufacturer in *DeLeon* was heavily involved in creating the dangerous condition that gave rise to the plaintiff's injury. DeLeon's injury resulted not from any intrinsic defect in the bin or the line shaft, but in the dangerous proximity of these two products. The bin manufacturer contributed to this dangerous condition because it designed the bin specifically for use in the particular site where it was located. (*DeLeon*, *supra*, 148 Cal.App.3d at pp. 341-342, 345.) The bin's designer visited the site but "never noticed the shaft

24

overhead, did not know what it was," and did not investigate to determine whether it presented a safety hazard. (*Id*. at p. 341.)

The *DeLeon* court itself observed that the case did not pose "a clear-cut legal question of component part liability," but instead presented "a factual issue of [the manufacturer's] involvement in design which will permit variations in the applicable rules of law depending upon how the trier of fact determines the extent of [the manufacturer's] design responsibility." (*DeLeon*, *supra*, 148 Cal.App.3d at p. 343.) The case is distinguishable on its facts and offers no rule of law supporting plaintiffs' position. "There is nothing in *DeLeon* that suggests that a manufacturer may be liable for failing to warn of the dangerous qualities of another manufacturer's product." (*Taylor*, *supra*, 171 Cal.App.4th at pp. 589-590.)

Plaintiffs' reliance on *Wright v. Stang Manufacturing Co*. (1997) 54 Cal.App.4th 1218 likewise fails. Firefighter Wright was injured when a deck gun he was using broke loose from its mounting assembly under high water pressure. (*Id*. at pp. 1222-1223.) Even though the deck gun itself did not break or "fail" in the accident, the Court of Appeal found a triable issue as to whether the gun was defectively designed because it did not include a "flange" mounting system and was not compatible for use with this safer mounting system. (*Id*. at p. 1229.) The court also concluded that the deck gun manufacturer could be liable for failing to warn users about the danger that could result from a foreseeable mismatch of the deck gun with inadequate attachment parts. (*Id*. at p. 1236.) *Wright* is factually distinguishable because the plaintiff was injured due to a failure of the entire deck gun assembly, of which the defendant's product was a component part. His injury was not traceable to a single product made by another manufacturer; it was allegedly caused by a foreseeable failure of the entire system to withstand high water pressure. An interpretation of *Wright* that would require a manufacturer to warn about all potentially hazardous conditions surrounding the use of a product, even when those hazards arise entirely from the product of another manufacturer,

25

reaches too far. There is no precedent in California law for such a broad expansion of a product manufacturer's duty.

Finally, the Court of Appeal below maintained that the result here was controlled by its prior decision in *Tellez-Cordova*, *supra*, 129 Cal.App.4th 577. We disagree. *Tellez-Cordova* is distinguishable on its facts, and its holding does not create a broader duty for manufacturers to warn about hazards arising solely from other products.

Tellez-Cordova developed lung disease from breathing toxic substances released from metals he cut and sanded and from abrasive discs on the power tools he used. (*Tellez-Cordova*, *supra*, 129 Cal.App.4th at p. 579.) He sued manufacturers of these tools, arguing they were "specifically designed" to be used with abrasive discs for grinding and sanding metals, and it was therefore reasonably foreseeable that toxic dust would be released into the air when the tools were used for their intended purpose. (*Id*. at p. 580.) Relying on *Garman v. Magic Chef, Inc.*, *supra*, 117 Cal.App.3d 634, and *Powell v. Standard Brands Paint Co.*, *supra*, 166 Cal.App.3d 357, the tool manufacturers argued California law imposed no duty on them to warn of hazards in the product of another. (*Tellez-Cordova*, at p. 585.) The tools themselves released no hazardous dust; the dust came from the abrasive discs that were attached to the tools and the metals they contacted. However, the Court of Appeal remarked that this argument "misse[d] the point," because the intended purpose of the tools was to abrade surfaces, and toxic dust was a foreseeable by-product of this activity. According to the complaint's allegations, "the tools had no function without the abrasives which disintegrated into toxic dust," and "the abrasive products were not dangerous without the power of the tools." (*Ibid*.)

The facts in *Tellez-Cordova* differed from the present case in two significant respects. First, the power tools in *Tellez-Cordova* could *only* be used in a potentially injury-producing manner. Their sole purpose was to grind metals in a process that inevitably produced harmful dust. In contrast, the normal operation of

26

defendants' pumps and valves did not inevitably cause the release of asbestos dust. This is true even if "normal operation" is defined broadly to include the dusty activities of routine repair and maintenance, because the evidence did not establish that defendants' products needed asbestos-containing components or insulation to function properly. It was the Navy that decided to apply asbestos-containing thermal insulation to defendants' products and to replace worn gaskets and packing with asbestos-containing components. Second, it was the action of the power tools in *Tellez-Cordova* that *caused* the release of harmful dust, even though the dust itself emanated from another substance. *Tellez-Cordova* is arguably an example of a "case where the combination of one sound product with another sound product creates a dangerous condition about which the manufacturer of each product has a duty to warn [citation]." (*Rastelli*, *supra*, 591 N.E.2d at p. 226.) The same is not true here. The asbestos dust that injured O'Neil came from thermal insulation and replacement gaskets and packing made by other manufacturers. Nothing about defendants' pumps and valves caused or contributed to the release of this dust. The Court of Appeal here characterized *Tellez-Cordova* as holding "that a manufacturer is liable when its product is necessarily used in conjunction with another product, and when danger results from the use of the two products together." In this case, neither requirement was met. Defendants' pumps and valves were not "necessarily" used with asbestos components, and danger did not result from the use of these products "together." The hazardous dust to which O'Neil was exposed resulted entirely from work performed on asbestos products that defendants did not manufacture, sell, or supply. The Court of Appeal's extension of *Tellez-Cordova* beyond its unique factual context could easily lead to absurd results. It would require match manufacturers to warn about the dangers of igniting dynamite, for example.

Moreover, as noted, California law does not impose a duty to warn about dangers arising entirely from another manufacturer's product, even if it is foreseeable that the products will be used together. Were it otherwise,

27

manufacturers of the saws used to cut insulation would become the next targets of asbestos lawsuits. Recognizing a duty to warn was appropriate in *Tellez-Cordova* because there the defendant's product was intended to be used with another product *for the very activity that created a hazardous situation*. Where the intended use of a product inevitably creates a hazardous situation, it is reasonable to expect the manufacturer to give warnings. Conversely, where the hazard arises entirely from another product, and the defendant's product does not create or contribute to that hazard, liability is not appropriate. We have not required manufacturers to warn about all foreseeable harms that might occur in the vicinity of their products. "From its inception, . . . strict liability has never been, and is not now, *absolute* liability. As has been repeatedly expressed, under strict liability the manufacturer does not thereby become the insurer of the safety of the product's user. [Citations.]" (*Daly v. General Motors Corp.*, *supra*, 20 Cal.3d at p. 733.)

### 4. *Conclusion*

We reaffirm that a product manufacturer generally may not be held strictly liable for harm caused by another manufacturer's product. The only exceptions to this rule arise when the defendant bears some direct responsibility for the harm, either because the defendant's own product contributed substantially to the harm (see *Tellez-Cordova*, *supra*, 129 Cal.App.4th at p. 585), or because the defendant participated substantially in creating a harmful combined use of the products (see *DeLeon*, *supra*, 148 Cal.App.3d at p. 343).

Plaintiffs here seek to expand these exceptions to make manufacturers strictly liable when it is foreseeable that their products will be used in conjunction with defective products or replacement parts made or sold by someone else. However, the foreseeability of harm, standing alone, is not a sufficient basis for imposing strict liability on the manufacturer of a nondefective product, or one whose arguably defective product does not actually cause harm. (Cf. *Peterson v. Superior Court*, *supra*, 10 Cal.4th at pp. 1199-1200 [refusing to extend strict liability to hotel operators based on "[t]he mere circumstance that it was

28

contemplated" that occupants would use potentially defective products installed in their rooms].)  Generally, foreseeability is relevant in a strict liability analysis to determine whether injury is likely to result from a potential use or misuse of a product.  (See *Daly v. General Motors Corp.*, *supra*, 20 Cal.3d at p. 733.)  That the defendant manufactured, sold, or supplied the injury-causing product is a separate and threshold requirement that must be independently established.  Moreover, in strict liability as in negligence, "foreseeability alone is not sufficient to create an independent tort duty."  (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552; cf. *Artiglio v. General Electric Co.*, *supra*, 61 Cal.App.4th at pp. 838-839 [foreseeability of harm from a finished product is not sufficient to impose a duty to warn on a component part manufacturer]; *Taylor*, *supra*, 171 Cal.App.4th at p. 586 [same].)  Generally, foreseeability is relevant in a strict liability analysis to determine whether injury is likely from a potential use or misuse of a product.  (See *Daly v. General Motors Corp.*, *supra*, 20 Cal.3d at p. 733.)

The question whether to apply strict liability in a new setting is largely determined by the policies underlying the doctrine.  (*Anderson v. Owens-Corning Fiberglas Corp.*, *supra*, 53 Cal.3d at p. 995.)  "[T]he strict liability doctrine derives from judicially perceived public policy considerations and therefore should not be expanded beyond the purview of these policies."  (*Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, 774.)  The conclusion we reach here is most consistent with the policies the strict liability doctrine serves.  Although "an important goal of strict liability is to spread the risks and costs of injury to those most able to bear them" (*Anderson*, at p. 1003), "it was never the intention of the drafters of the doctrine to make the manufacturer or distributor the insurer of the safety of their products.  It was never their intention to impose *absolute* liability." (*Id*. at pp. 1003-1004.)  Like the landlords and hotel owners we excused from strict liability in *Peterson v. Superior Court*, *supra*, 10 Cal.4th at page 1199, product manufacturers "generally ha[ve] no 'continuing business relationship' " with each other.  (See *Vandermark v. Ford*

*Motor Co.*, *supra*, 61 Cal.2d at p. 263.)  This means that a manufacturer cannot be expected to exert pressure on other manufacturers to make their products safe and will not be able to share the costs of ensuring product safety with these other manufacturers.  (*Peterson v. Superior Court*, at p. 1199.)  It is also unfair to require manufacturers of nondefective products to shoulder a burden of liability when they derived no economic benefit from the sale of the products that injured the plaintiff.

A contrary rule would require manufacturers to investigate the potential risks of all other products and replacement parts that might foreseeably be used with their own product and warn about all of these risks.  "It does not comport with principles of strict liability to impose on manufacturers the responsibility and costs of becoming experts in other manufacturers' products."  (*Braaten*, *supra*, 198 P.3d at p. 502.)  Such a duty would impose an excessive and unrealistic burden on manufacturers.  (See *Baughman*, *supra*, 780 F.2d at p. 1133; see also *Braaten*, at p. 502 [evidence showed that more than 60 types of packing were approved for naval use].)  Perversely, such an expanded duty could also undermine consumer safety by inundating users with excessive warnings.  "To warn of all potential dangers would warn of nothing."  (*Andre v. Union Tank Car Co., Inc.* (1985) 213 N.J. Super. 51, 67 [516 A.2d 277, 286].)

## II.     *No Duty of Care to Prevent Injuries from Another Manufacturer's Product*

Defendants also moved for nonsuit of plaintiffs' negligence claims.  Although the Court of Appeal declined to address these claims, plaintiffs continue to assert negligence as an alternative basis for liability.  Because the negligence issue here concerns the scope of defendants' duty, and the existence of duty is a pure question of law (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477), we need not remand to the Court of Appeal for an initial determination.

" ' "[D]uty" is not an immutable fact of nature " 'but only an expression of the sum total of those *considerations of policy* which lead the law to say that the

particular plaintiff is entitled to protection.' " [Citation.]' [Citation.]" (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472.) Courts of this state have traditionally considered several factors in determining the existence and scope of duty: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113.)

Plaintiffs stress that foreseeability is the critical inquiry in evaluating whether a duty of care is owed. (See *Tarasoff v. Regents of the University of California* (1976) 17 Cal.3d 425, 434.) However, as noted, "foreseeability alone is not sufficient to create an independent tort duty." (*Erlich v. Menezes*, *supra*, 21 Cal.4th at p. 552; see also *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 399.) Instead, the recognition of a legal duty of care " 'depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability.' " (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1072.) In some cases, when the consequences of a negligent act must be limited to avoid an intolerable burden on society, "policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk." (*Elden v. Sheldon* (1988) 46 Cal.3d 267, 274; see also *Bily v. Arthur Young & Co.*, at p. 398.) "In short, foreseeability is not synonymous with duty; nor is it a substitute." (*Erlich v. Menezes*, at p. 552.)

Assuming that a manufacturer can "reasonably be expected to foresee the risk of latent disease arising from products supplied by others that may be used with the manufacturer's product years or decades after the product leaves the

manufacturer's control" (*Taylor*, *supra*, 171 Cal.App.4th at p. 594),[12] we nevertheless conclude strong policy considerations counsel against imposing a duty of care on pump and valve manufacturers to prevent asbestos-related disease.

The factors set forth in *Rowland v. Christian*, *supra*, 69 Cal.2d at page 113, do not support a finding of duty in this case. The connection between defendants' conduct and O'Neil's injury is extremely remote because defendants did not manufacture, sell, or supply any asbestos product that may have caused his mesothelioma. O'Neil did not work around defendants' pumps and valves until more than 20 years after they were sold, and he did not develop an injury from the replacement parts and surrounding insulation until nearly 40 years after his workplace contact. All of these circumstances attenuate the connection between defendants' products and the alleged injury. Furthermore, little moral blame can attach to a failure to warn about dangerous aspects of *other* manufacturers' products and replacement parts.[13] Nor would imposing a duty of care in this context be likely to prevent future harm. There is no reason to think a product manufacturer will be able to exert any control over the safety of replacement parts or companion products made by other companies. Manufacturers may also have scant ability to influence their customers' choices about other products. In this case, for example, the evidence showed defendants had no control over the Navy's purchasing choices or specifications, either at the time they provided pumps and valves for warships or later, when replacement parts were needed. In contrast,

---

[12] But see *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 779: "Generally speaking, where the injury suffered is connected only distantly and indirectly to the defendant's negligent act, the risk of that type of injury from the category of negligent conduct at issue is likely to be deemed unforeseeable."

[13] Indeed, there can be little doubt that defendants' conduct was "of high social utility." (*Parsons v. Crown Disposal Co.*, *supra*, 15 Cal.4th at p. 474.) Defendants' pumps and valves were important components in the steam propulsion systems of warships that were vital to our country's national defense during World War II and later periods.

recognizing a duty of care would clearly impose a significant burden on defendants and all other companies that could potentially be held liable for injuries caused by products they neither made nor sold. Because the recognition of such a duty could lead to an overabundance of potentially conflicting product warnings, consumers could also suffer harm from the broad expansion of liability plaintiffs seek. Finally, it is doubtful that manufacturers could insure against the "unknowable risks and hazards" lurking in every product that could possibly be used with or in the manufacturer's product. (*Anderson v. Owens-Corning Fiberglas Corp.*, *supra*, 53 Cal.3d at p. 1003, fn. 14.)

In short, expansion of the duty of care as urged here would impose an obligation to compensate on those whose products caused the plaintiffs no harm. To do so would exceed the boundaries established over decades of product liability law. " '[S]ocial policy must at some point intervene to delimit liability' even for foreseeable injury. . . ." (*Parsons v. Crown Disposal Co.*, *supra*, 15 Cal.4th at p. 476.) The same policy considerations that militate against imposing strict liability in this situation apply with equal force in the context of negligence. (*Taylor*, *supra*, 171 Cal.App.4th at p. 596.)

Because defendants owed O'Neil no duty of care, the trial court properly entered nonsuit on plaintiffs' negligence claims.

## DISPOSITION

The decision of the Court of Appeal is reversed, and the case is remanded for entry of a judgment of nonsuit in favor of defendants.


**CORRIGAN, J.**


**WE CONCUR:**


**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** O'Neil v. Crane Co.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 177 Cal.App.4th 1019
**Rehearing Granted**

_____

**Opinion No.** S177401
**Date Filed:** January 12, 2012
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Elihu Berle

_____

**Counsel:**

Waters Kraus & Paul, Paul C. Cook, Michael B. Gurien; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiffs and Appellants.

Brayton ♦ Purcell, Alan R. Brayton, Gilbert L. Purcell, Lloyd F. Leroy and Richard M. Grant for American Merchant Marine Veterans as Amicus Curiae on behalf of Plaintiffs and Appellants.

Kazan, McClain, Lyons, Greenwood & Harley, James L. Oberman and Michael T. Stewart for John and Diane Allen, Robert and Beverly Lindenmayer, Joan Tommaney and Darrell and Suzanne Turner as Amici Curiae on behalf of Plaintiffs and Appellants.

Marc I. Willick for Mesothelioma Applied Research Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Terrence M. Johnson; Girardi | Keese, Thomas V. Girardi; Cronin & Co. and Thomas C. Cronin for International Association of Heat and Frost Insulators and Allied Workers as Amici Curiae on behalf of Plaintiffs and Appellants.

Simon, Eddins & Greenstone and Brian P. Barrow for Tamara Merrill and Edward Walton as Amici Curiae on behalf of Plaintiffs and Appellants.

Horvitz & Levy, David M. Axelrad, Jason R. Litt, Curt Cutting, K&L Gates, Raymond L. Gill, Robert E. Feyder, Geoffrey M. Davis, Paul J. Lawrence and Nicholas P. Vari for Defendant and Respondent Crane Co.

Carroll, Burdick & McDonough, James P. Cunningham, Laurie J. Hepler and Gonzalo C. Martinez for Defendant and Respondent Warren Pumps LLC.

**Counsel:**

Shook, Hardy & Bacon, Mark A. Behrans and Kevin Underhill for Coalition for Litigation Justice, Inc., Chamber of Commerce of the United States of America, National Association of Manufacturers, NFIB Small Business Legal Center, American Tort Reform Association, National Association of Mutual Insurance Companies, Association of California Insurance Companies, American Insurance Association, American Petroleum Institute and American Chemistry Council as Amici Curiae on behalf of Defendants and Respondents.

Wildman, Harrold, Allen & Dixon, Clinton J. McCord, Stephen J. Landes, Douglas L. Prochnow and Rana H. Janney for Rockwell Automation, Inc., and Invensys PLC as Amici Curiae on behalf of Defendants and Respondents.

Debevoise & Plimpton, Roger E. Podesta, Erich O. Grosz; Gordon & Rees, Michael J. Pietrykowski and Don Willenburg for Ingersoll Rand Company as Amici Curiae on behalf of Defendants and Respondents.

Bates White and Charles E. Bates as Amici Curiae on behalf of Defendants and Respondents.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

Deborah J. La Fetra for Pacific Legal Foundation as Amici Curiae on behalf of Defendants and Respondents.

Sedgwick, Detert, Moran & Arnold, Frederick D. Baker and Brian R. Thompson for Caterpillar, Inc., as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jeffrey Isaac Ehrlich
The Ehrlich Law Firm
411 Harvard Avenue
Claremont, CA 91711
(909) 625-5565

Nicholas Vari
K&L Gates
10100 Santa Monica Boulevard, 7th Floor
Los Angeles, CA 90067
(310) 552-5000

Laurie J. Hepler
Carroll, Burdick & McDonough
44 Montgomery Street, Suite 400
San Francisco, CA 94104
(415) 989-5900